In re SCHAEFFER et al.

Nos. 7942, 7943.

District Court, D. Maryland.

April 2, 1936.

Z. N. Diamond, I. P. Whitehead and Peyton G. Jefferson, all of Baltimore, Md., for Federal Land Bank.

Robert H. McNeill, of Washington, D. C., for debtors.

CHESNUT, District Judge.

In these cases in bankruptcy under United States Code, title 11, § 203 (11 U. S.C.A. § 203), including subsection (s) as enacted August 28, 1935 (11 U.S.C.A. § 203 (s) (the second Frazier-Lemke Mortgage Moratorium Act), the Federal Land Bank of Baltimore is seeking freedom to foreclose a mortgage on 517 acres of farm land in Montgomery County, Maryland, which was mortgaged to it by the debtors in 1925; and the debtors are resisting the mortgagee's application, under the asserted authority of that Act of Congress.

The Bank has not raised the question of the constitutionality of the second Frazier-Lemke Act, and there is, therefore, no occasion to consider that subject in this case.[1]

---

[1] The first Frazier-Lemke Act, which added the original subsection (s) to section 75 of the Bankruptcy Act (48 Stat. 1289) was held unconstitutional by the Supreme Court in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106. See, also, In re Bradford (D.C. Md.) 7 F.Supp. 665, affirmed Bradford v. Fahey (C.C.A.4) 77 F.(2d) 992. Thereafter on August 28, 1935, Congress passed the second Frazier-Lemke Act, 49 Stat. 942 (11 U.S.C.A. § 203 (s).

This second Frazier-Lemke Act has been likewise held unconstitutional in the following cases: In re Lowmon (C.C.A. 7) 79 F.(2d) 887; In re Diller (D.C.Cal.) 13 F.Supp. 249; In re Davis (D.C.N.Y.) 13 F.Supp. 221; In re Lindsay (D.C. Iowa) 12 F.Supp. 625; In re Sherman (D.C.Va.) 12 F.Supp. 297; In re Young (D.C.Ill.) 12 F.Supp. 30; In re Tschoepe (D.C.S.D.Tex.) 13 F.Supp. 371, and In re Schoenleber (D.C.Neb.) 13 F. Supp. 375; but has been held constitutional in the following cases: In re Cole

The Bank does, however, contend that the debtors in this case are not entitled to the three-year moratorium for a number of reasons of which the principal are the following: (a) That the debtors are not farmers within the meaning of the act; (b) that they did not comply with the provisions of section 75, as amended (11 U.S. C.A. § 203) which constitutes a condition precedent to the application of subsection (s) in that they did not submit to the Conciliation Commissioner in good faith a reasonable and equitable proposition for composition of their indebtedness to their creditors, including the Bank as a secured creditor.

In order to understand just how the subject matter is now presented to the court, it is necessary to say something in explanation of the complicated procedure in this case. This complication has been occasioned principally by the changing legal situation caused by the original Frazier-Lemke Law, the judicial determination that it was unconstitutional, and the passage of the second Frazier-Lemke Act. The original proceeding in this case was filed August 30, 1934, shortly after the passage of the first Frazier-Lemke Act on June 28, 1934, 48 Stat. 1289, and the approval of the debtors' petition operated automatically to stay foreclosure of the mortgage, pending further proceedings. The case was thereupon referred in due course to the Conciliation Commissioner before whom counsel for the Federal Land Bank appeared and made objection to the proceedings. The debtors submitted an original, and subsequently an amended, proposition for composition of their indebtedness, both secured and unsecured. It was, however, not a definite and absolute proposition but was made conditional on the debtors' winning a then existing law suit in a Maryland State Court, the Circuit Court for Montgomery County, in which it was stated that there was an issue pending as to the title of the debtors to certain live stock and farming equipment which was essential to them for the conduct of the dairy farm covered by the mortgage to the Bank. There was no acceptance of this merely conditional offer by the creditors and the report of the Conciliation Commissioner was to the effect

that the proceeding should be dismissed. Shortly thereafter the debtors filed an amended petition under the then existing subsection (s) of the law (48 Stat. 1289) asking to be adjudicated bankrupts and to have the benefit of the five-year moratorium as to their mortgage indebtedness. This was formally opposed by the Bank, but nothing further material transpired in the case until after the Supreme Court determined in the case of the Louisville Joint Stock Land Bank v. Radford, 295 U. S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A. L.R. 1106, on May 27, 1935, that subsection (s) of the act was unconstitutional. Thereafter, on August 16, 1935, the court, on the petition of the Bank, gave leave to it to proceed with the foreclosure of its mortgage; but shortly thereafter, and pending the mortgage foreclosure proceeding in the State Court, the debtors filed a new petition seeking the benefit of the second Frazier-Lemke Act, subdivision 5 of which (11 U.S.C.A. § 203 (s) (5) provided that "this title shall be held to apply to all existing cases now pending in any Federal court, under this title, as well as to future cases; and all cases that have been dismissed by any conciliation commissioner, referee, or court because of the Supreme Court decision holding the former subsection (s) unconstitutional, shall be promptly reinstated, without any additional filing fees or charges." This application of the debtors was granted *ex parte* by the court; and the case was again referred to the Conciliation Commissioner for further proceedings under the new subsection (s), and further action in the mortgage foreclosure was temporarily discontinued, the parties apparently treating the ex parte order as in effect a renewed stay of the foreclosure, although no express order therefor was signed, as is seemingly contemplated by subsection (s) (2), 11 U.S.C.A. § 203 (s) (2); but shortly thereafter the Bank petitioned for a rescission of the ex parte order substantially on the grounds above stated. This petition of the Bank was answered and resisted by the debtors, and a preliminary hearing on the questions raised led to an amended and more extended petition of the Bank in support of its position, which in turn was answered by the debtors. On

---

(D.C.Ohio) 13 F.Supp. 283; In re Reichert (D.C.Ky.) 13 F.Supp. 1; In re Slaughter (D.C.Tex.) 12 F.Supp. 206; In re Bennett (D.C.Mo.) 13 F.Supp. 353, Otis, United States District Judge, and In re James M. Paul (D.C. Iowa) 13 F. Supp. 645, Dewey, United States District Judge.

the issues thus framed by the amended papers, testimony has been taken and the matter now submitted for determination. In the meantime, however, the Conciliation Commissioner has filed a second report stating that the farm had been appraised as of the value of $25,850; and its rental value appraised at $1,500 a year if operated as a dairy farm; otherwise at $1,000 a year. The Commissioner further reported in effect that the debtors' financial condition was hopeless and recommended a dismissal of the case.

It is thus apparent that from the outset of this proceeding the debtors have been vigilantly asserting, and the Bank has been throughout promptly and earnestly resisting, the stay of the mortgage foreclosure. While the question has not heretofore been pressed to final decision by the court, it is also apparent that there have been no laches on the part of the Bank. The delay which has occurred has been due for the most part to the pendency of litigation regarding the validity of the first Mortgage Moratorium Act and the subsequent passage of the substituted act.

Specifically what the Bank is now seeking is a rescission of the ex parte order of September 21, 1935 granting the amended petition of the debtors and adjudicating them bankrupts under the new subsection (s), and a dismissal of the proceedings under section 203, so that the Bank can be free to proceed with its mortgage foreclosure as permitted by the order of August 16, 1935, which was treated as superseded in effect by the ex parte adjudication in bankruptcy under subsection (s).

To properly understand the principal ground on which the Bank seeks this relief, there is required some analysis of the whole of section 203, because it is to be importantly noted that the second Frazier-Lemke Act providing for the mortgage moratorium is not an independent provision applicable to all farmer bankrupts but is, as indeed was also the former subsection (s), a dependent part of section 203. That is to say, the benefits to the farmer provided for in subsection (s) are available only on the condition of original compliance by the farmer debtor with the procedural requirements of the preceding subsections of section 203. By them, it is provided, so far as applicable to this case, that the farmer debtor must file a petition, accompanied by schedules of assets and liabilities, stating that the farmer is insolvent or unable to meet his debts as they mature, and that it is desirable to effect a composition or extension of time to pay his debts. Upon the approval of the petition (usually ex parte) the case is referred to a Conciliation Commissioner who is to promptly call the first meeting of creditors with notice that the farmer proposes to offer terms of composition or extension, and with a summary of his assets and liabilities. If the composition offered is accepted by a majority in number of all creditors whose claims have been allowed, including secured creditors, an application may thereafter be made to the court for confirmation; which, however, is to be ordered only if the court is satisfied that "(1) it includes an equitable and feasible method of liquidation for secured creditors and of financial rehabilitation for the farmer; (2) it is for the best interests of all creditors; and (3) the offer and its acceptance are in good faith, and have not been made or procured except as herein provided, or by any means, promises, or acts herein forbidden." Bankr.Act, § 75 (i), 11 U.S.C.A. § 203 (i). It is provided that the terms of the farmer's proposal may (1) extend the time of payment; (2) provide for priority of payments during the extended period between secured and unsecured creditors and (3) may include specific undertakings of the farmer for payments on account and for supervisory or other control by the Conciliation Commissioner over the farmer's affairs. It will have been noted that the court may not confirm the farmer's proposal unless it has previously been approved by a majority of both secured and unsecured creditors. If, and only if, the creditors withhold their approval after such a proposal as is contemplated by the section has been made by the farmer, does subsection (s) come into operation, except that it is also provided in subsection (s) that the farmer may act thereunder "if he feels aggrieved by the composition and/or extension" (a somewhat obscure phrase in its application but with which we are not here concerned). In the events just mentioned the farmer "may amend his petition or answer, asking to be adjudged a bankrupt" and then petition the court for the benefits of subsection (s), which in short substance may be described as a three-year mortgage moratorium against foreclosure.

■ It is thus seen that there are necessary conditions precedent to the right of the farmer debtor to avail himself of the mortgage moratorium provided by subsection (s). It seems quite clear from section 203 as a whole that the farmer must first have submitted to his creditors a proposal which *"in good faith* contains an equitable and feasible method of liquidation for creditors;" and is for their best interests, as well as his own. Unless and until the farmer has made such a proposal which the court can subsequently find complies with these characteristics, subsection (s) is not available to him. And the principal contention of the Bank in this case is that these farmer debtors have not made such a proposal. In numerous federal decisions it has been held that subsection (s) is available to the farmer debtor only on the conditions above stated. In re Borgelt, 79 F.(2d) 929 (C.C.A.7) affirming (D.C.) 10 F.Supp. 113; In re Wilkin (D.C. Iowa) 8 F.Supp. 222; In re Samuelson (D.C.Iowa) 8 F.Supp. 473, 474; In re West (D.C.) 10 F.Supp. 407; In re Hilliker (D.C.S.D.Cal.) 9 F.Supp. 948; In re Duvall (D.C.W.D.Va.) 14 F.Supp. 799; In re Siske[2] (D.C.M.D.N.C.).

To determine whether the proposal made by the farmer debtors in this case complied with the requirements that (1) it was in good faith; (2) constituted an equitable and feasible method of liquidation for creditors and the financial rehabilitation of the farmer and (3) was for the best interests of creditors, requires a condensed summary of the more important facts regarding the debtors' property and financial situation at the time of the institution of the proceedings and up to the present time. There was much testimony on this point but the principal facts established are these. The mortgage was made December 2, 1925, for $22,000 at 5½% interest. It covered the debtors' large dairy farm in Montgomery County, consisting of 517 acres, most of which was suitable for general farming but the principal productive activity was the conduct of a large dairy farm. The mortgage conditions were apparently complied with until the end of 1931, since which time the debtors have made no payment on account of the mortgage either principal or interest although some small sums otherwise on hand have been credited by the Bank to

the mortgage, the last being on December 18, 1933. The net balance due as of the present time is $23,978.74. Taxes at the rate of nearly $500 a year are in default for 1933, 34 and 35. 65 acres of the farm have already been sold for unpaid taxes (although presumably still subject to redemption) and 40 acres more are advertised for sale on April 13, 1936. For some months past the property has been entirely abandoned both for farming and dairy operations and even for residential purposes by the debtors. In consequence the property is naturally depreciating.

The bankruptcy schedules filed September 20, 1934 list assets in the amount of $29,760, including the mortgaged farm valued at $20,000 and live stock and farming implements at about $9,000. The debts were listed at $22,500 in the summary (otherwise shown from the schedules and from the testimony and report of the Conciliation Commissioner to be clearly inaccurate in that the unsecured indebtedness alone was approximately $37,000 in amount). In 1933 the farmers were indebted to the Montgomery County National Bank in the amount of about $10,000, and the County Bank held as security a bill of sale on the live stock and farming equipment. This Bank was then pressing for payment and the farmers secured the help of a friend, a Mr. Dorcus, who, it appears, paid the Bank $3,000 in satisfaction of its claim and took a new bill of sale from the farmers covering the live stock and farming equipment. Dorcus shortly thereafter died and his sister, Elsie Dorcus, succeeded to his interests. By advice of counsel an informal lease was made by the farmers to her in consideration of $1.00 and other considerations, whereby the farm was leased to her for a period of two years ending August 28, 1935. Miss Dorcus also held a judgment against the debtors for $4,500. In December 1933 she in turn asked the farmers for payment and thereupon after some negotiations one Lawson King, to whom the farmers were indebted in the amount of about $1,700 to $1,800, paid Miss Dorcus the net amount then due her, $2,581.25, and in turn received a new bill of sale for the live stock and farming equipment from the farmers. He also took an assignment of the lease.

---

[2] No opinion filed.

The most important controversial fact covered by the extended testimony in this case deals with the issue as to whether, in this latter transaction, King became in effect only a creditor of the farmers or made an outright purchase of the live stock and farming equipment. It is his contention that he became the absolute owner while the farmers earnestly contend that he was only a creditor. The principal source of income from the farm was milk produced by the dairy herd. During the period of the interest of Mr. and Miss Dorcus, respectively, the proceeds from the sale of milk were paid over to a Mr. Welsh, a Rockville attorney, who in turn, after deducting partial payments for the benefit of his clients, Mr. and Miss Dorcus, turned over in cash the balance of the proceeds to the farmers, and they disbursed it for running expenses and other purposes at will. But when King succeeded to the legal title, a change was made in the operations of the farm and the dairy. King himself took personal charge of the activities on the farm and received the proceeds of the sale of the milk; he also paid all expenses of operation and made an arrangement with the Schaeffers that they should be employed on a monthly salary of $65 to George Schaeffer and a somewhat smaller sum to Allen Schaeffer. At the end of three months Allen Schaeffer retired to conduct other business, and George Schaeffer remained for some months until shortly after the original filing of this proceeding in September 1934, at which time he undertook to resume personal charge of operations and asserted the right to receive the milk check, whereupon King discharged him and continued his operations on the farm until the expiration of the lease in the fall of 1935, at which time he removed all the live stock and farming equipment covered by the bill of sale from the property. During the period of King's operations, numerous changes took place in the dairy herd, some stock being sold and others bought, and, at least according to King's testimony, numerous additional dairy cattle were bought by him and added to the herd. It is this live stock and farming equipment that is now listed as assets to the value of about $9,000 in the schedules. During the latter part of 1934, the Schaeffers again appealed to their friend Miss Dorcus for aid, with the result that she instituted in the Circuit Court for Montgomery Coun-

ty, a suit against King in which she sought a rescission of her sale to him and also specific performance of his alleged promise to buy her judgment of $4,500 against the Schaeffers. The underlying theory of this suit seems to be that King took title from Miss Dorcus really as a creditor only, and not as an absolute purchase, that his pretensions to the contrary are fraudulent, and that the equity, if any, in the chattel property is still in the Schaeffers. Although the suit seems to have been brought in the interest of the Schaeffers, they were not originally made parties thereto, but subsequently were made parties plaintiff as a result of a demurrer by the defendant for lack of necessary parties.

We thus find that in August 1934, when this proceeding was first filed, the situation affecting the debtors and their property was that King was in possession claiming to be the owner of all the live stock and farming equipment and a tenant of the farm; and while the Schaeffers were the legal owners of the equity in the farm subject to the mortgage, they were not in possession of either the real estate or the personal property or business, although George Schaeffer for some time thereafter continued to occupy the dwelling on the farm, which was not covered by the lease. It should also be said that under the Maryland conveyancing law, both statutory and case, a bill of sale is in form an absolute conveyance of title but may be shown by parol testimony to constitute merely a security in the nature of a chattel mortgage. In this case the testimony shows that King had papers indicating on their face complete and absolute title, which he asserted were in fact what they purported to be and not, as orally contended by the debtors, merely security for a loan. It is also apparent that in addition to the mortgage indebtedness on the farm the Schaeffers were heavily indebted to the amount of more than $37,000 to numerous creditors most of whom had no security, (other than judgments subordinate to the mortgage) and they had no assets of any substantial value other than the equity in the farm and their disputed claim to an equity in the live stock and farming equipment.

It is also important to know that shortly prior to the filing of this proceeding in August, 1934, George Schaeffer (who had made an agreement to buy out his brother's interest in the equity in the property,

both real and personal) had negotiated, with the assistance of a state appointed farmers' debt conciliation committee, to effect a settlement with all his creditors. It was proposed to extend the mortgage for several years and to pay ten per cent. to other creditors. To accomplish this it was necessary for him to obtain an additional loan from the Federal Land Bank, acting as agent for the Land Bank Commissioner, in the amount of $7,500 on the real property, and a loan in the amount of $6,500 on the personal property from the Frederick Production Credit Association. Written application for the loan of $7,500 was made in July 1934 to the Bank accompanied with a letter from King in which he offered to sell or release all his interest in the live stock and farming equipment, with certain specific exceptions, for $8,500. This would seem to have been at least an implied admission or representation by George Schaeffer that King's interest was at least $8,500 in the chattel property. It is said that nearly all the general creditors expressed willingness to accept the proposition but it failed because the Bank declined to make the further loan. In the application the value of the real property, land and improvements, was placed at $76,930 which is to be contrasted with the valuation thereof at $20,000 contained in the schedules filed in September 1934.

It is in the light of this legal and financial situation of the debtors that we must answer the question as to whether the proposal made by the debtors constitutes a compliance with the requirements of section 203 precedent to subsection (s).

The debtors' amended proposal made January 24, 1935, to the Conciliation Commissioner is contained in Exhibit F annexed to the report of the Commissioner filed February 25, 1935. In it the debtors propose to pay to the Federal Land Bank "any and all amounts now in arrears at the rate of one-sixth of same per annum for a period of six years and to keep paid on said secured indebtedness all payments in the amounts and as specified in the mortgage securing the same." The debtors further proposed to pay to the unsecured creditors in full settlement thereof 10% of the face value thereof. But the proposal was only made "subject to a favorable decision by the Circuit Court of Montgomery County, Maryland, determining that the petitioner and George W. Schaeffer, his brother, jointly owned the personal property on their farm in Montgomery County, Maryland, as set forth in their petitions herein filed and as shown by bill of complaint filed in the Circuit Court for Montgomery County by Elsie I. Dorcus v. Lawson W. King, Equity 3371." The debtors further stated in their proposal that "the only proposition he can make to his creditors is subject to the conditions above and that said proposition cannot be made absolute unless and until there has been a decision by the Circuit Court of Montgomery County, Maryland, as to said titles and rights of possession, and your petitioner therefore respectfully prays to the Court and the Conciliation Commissioner for a postponement of any further consideration of his said petition and this proposition until there has been a final adjudication of the question of title to his said properties, either by the said Circuit Court and/or by the District Judge holding this Court of bankruptcy."

The proposal contains no express provision as to how or when or in what way the accrued and unpaid taxes on the property will be paid. Nor does it indicate how or when the 10% to unsecured creditors was to be provided. And these omissions are significant in view of the prior unsuccessful negotiations of the debtors to accomplish a substantially similar settlement shortly before the filing of the proceeding. And it may be further observed that since the proposal was made another year has now elapsed during which the debtors have been unable to pay any of the unpaid taxes or interest on the mortgage debt and the pending case affecting title to their chattel property has not yet been heard by the State court; and it was further indicated at the hearing in this case that whatever the decision therein by the trial court there is a strong probability of appeal by the losing party. In this connection it may be observed that indefinite delay on the part of the debtors in submitting a proposal is clearly not contemplated by the Act, and as further regulated by the general orders in bankruptcy promulgated by the Supreme Court. Subdivision 4 of General Order 50 (11 U.S. C.A. following section 53) affecting proceedings under section 75 of the Bankruptcy Act (section 203, title 11 of the Code [11 U.S.C.A. § 203]) provides in effect that the proposal must have been submitted within three months after the date

of the first meeting of creditors called by the Conciliation Commissioner. Here more than a year has elapsed since the creditors' first meeting in this proceeding and the debtors have still made no absolute and certain proposal. In a similar situation the Circuit Court of Appeals for the 7th Circuit held that a farmer debtor was not entitled to the benefit of the original subsection (s) of section 203 where the only proposal previously made to creditors was to pay a certain sum provided the debtor could negotiate a new loan. In re Borgelt, 79 F.(2d) 929, affirming (D.C.) 10 F.Supp. 113.

In my opinion the debtors' proposal made in this case was not substantially different in legal effect from that adjudicated to be no proposal at all within the contemplation of the Act in the Borgelt Case. And as I have found no federal appellate court decisions to the contrary, I feel that I should apply the rule of that decision here in this case.

In addition to this consideration the Bank in this case also contends that the debtors' proposal, under the circumstances stated, should not be regarded as having been made "in good faith" because (a) the debtors were substantially only farm laborers and not farmers [see In re Fullagar (D.C.N.Y.) 8 F.Supp. 602; In re Johnson (D.C.) 149 F. 864]; (b) that pending these proceedings the debtors sold some of the farm crops not removed by King for $40 without reporting the matter to the Conciliation Commissioner; (c) they also allowed a herd of cattle belonging to their attorney to be pastured on the farm property without compensation; (d) that the conditional proposal as finally made is inequitable to the mortgage creditor and not feasible, and in itself affords no basis for the successful rehabilitation of the farmer within any reasonable period of time. I think it unnecessary to discuss the first three of these contentions. The question as to whether the debtors were really and substantially farmers as defined in the act, or merely farm laborers not entitled to the benefit of the act, is necessarily bound up in the ultimate determination of what was their true legal relation to King, a question which is now still pending in the State Court and which I regard as unnecessary to decide here. The other contentions denominated (b) and (c) are, I think, not of controlling importance one way or the other. Putting aside these particular contentions, the remaining point as to whether the plan is feasible and equitable within the meaning of the Act is of substantial importance. The requisite of "good faith" in its present context, would clearly seem to import more than its primary significance of absence of actual fraud. It seems to imply that the debtors' proposal must be something more than a futile gesture or a mere formality, to carry the proceeding further under subsection (s). The main purpose of the Act is to afford temporary relief to a financially embarrassed farmer whose circumstances, despite present difficulties, afford a reasonable expectation of ultimate financial rehabilitation. That is to say, the purpose of the Act is to keep the farmer a "going concern" on his farm during an emergency period and with reasonable expectation of ultimate debt satisfaction within a three-year period. Where the circumstances are such that there is no reasonable probability of this ultimate result, it cannot fairly be said that the proposal is made in good faith within the meaning of the Act as construed by the decisions. The same phrase occurs in other recently added sections of the Bankruptcy Act and particularly in sections 74 and 77B (11 U.S.C.A. §§ 202, 207), and the construction thereof in cases under those sections would seem to furnish close analogies, and are to the effect as above stated. Manati Sugar Co. v. Mock (C.C.A.2) 75 F.(2d) 284; In re Sterba (C.C.A.7) 74 F.(2d) 413; In re Grigsby-Grunow. Co. (C.C.A.7) 77 F.(2d) 200; In re Cosgrave (D.C.Cal.) 10 F. Supp. 672; In re Tennessee Pub. Co. (C. C.A.6) 81 F.(2d) 463. Compare In re Slaughter (D.C.Tex.) 12 F.Supp. 206.

Treating the second Frazier-Lemke Act as constitutional, as must be done in this case, its provisions should be applied liberally in the interests of the debtor but also reasonable regard must be had to the rights of the creditors. One of the differences between the first and second Frazier-Lemke Acts is that in the latter the District Court is given a wider range of discretion with regard to the application of the Act than in the former. Notably in subsection (s) (6), 11 U.S.C.A. § 203 (s) (6) it is provided "this title is hereby declared to be an emergency measure and if in the judgment of the court such emergency ceases to exist in its locality, then the court, in its discretion, may shorten the stay of proceedings therein provided

for and proceed to liquidate the estate." This particular provision has been criticized as invalid in that it fails to provide a rule of action uniformly applicable throughout the country, [See In re Slaughter (D.C.Tex.) 12 F.Supp. 206]; but despite this it, with other sections of the statute, would seem to indicate the intention was to make the administration of the Act more flexible than were the provisions of the former Act. To the extent that discretion is here exercisable, it would certainly seem under all the facts stated that it would be highly inequitable to the Banking creditor to continue in force the stay against foreclosure of its mortgage. The interest has been in default for nearly 5 years, the taxes have been unpaid for 3 years, some of the land has been already sold for unpaid taxes with the redemption period nearly run out, and the property itself now abandoned and depreciating. To remedy this existing condition of affairs the debtors offer only possible betterment in the future if they are successful in winning a law suit, the time of the final decision of which cannot be stated and which may very probably not be reached for another six months or a year. In the meantime, more of the property will be sold for taxes. And contrasted with these very definite disadvantages to the secured creditor, the present situation of the debtors affords little or no prospect of advantage to them if the status quo is continued. Indeed the conclusion of the Conciliation Commissioner, on the evidence before him that the debtors' financial condition seems to be hopeless, is further supported by the recent testimony at the hearing in this court.

The testimony in the case shows very convincingly that the debtors' present financial embarrassment has been caused chiefly by poor personal management and accidental misfortune, and is not due in any substantial degree to the general economic conditions, which as an emergency called forth the Act of Congress. Some years ago substantial buildings on the farm were destroyed by fire without adequate insurance. They were replaced with new and more costly buildings, which created a good part of the now unsecured indebtedness. At that time much of the live stock was sold at a loss and some to defaulting purchasers, and the stock later replaced on credit. And there is credible evidence to the effect that conditions now affecting the dairy business in that locality are such that they could be conducted at a reasonable profit, with good management, if the debtors had the live stock and farming equipment necessary therefor. Even if their main contention against King ultimately prevails, it is by no means clear that they will retrieve sufficient stock to resume dairy operations on a profitable scale. And it may also be observed that, assuming King is only a secured creditor, the testimony in the case would warrant the inference that the relations of the debtors to the County Bank, and to Dorcus and King, with respect to the chattel property, was such as to hinder and delay other creditors. If this was the purpose of putting the conveyances of personal property into absolute form, which has enabled King to take the position in the matter for which he now contends, it would seem the debtors are the authors of their own misfortunes.

At the recent hearing the debtors offered in evidence a written offer from an apparently responsible third person to lease the farm property for a term of years at $1,500 annual rent. Counsel for the Bank objects that such an offer is not within the contemplation of the act which looks to the continuance of the farmer on his farm. But beside this it is clear such an offer is not a compliance with section 203, because not made in time and not submitted to the creditors generally. And in itself it is not adequate to the case. It in no way looks to the ultimate debt liquidation and would not meet the present pressing critical situation as to the unpaid taxes. If the debtors had otherwise complied with section 203, the offer might possibly be considered as a temporary measure for the control of the property.

Upon consideration of the whole facts of the particular case, I reach the conclusion that the debtors have not complied with the provisions of section 203 to entitle them to the three-year moratorium provided in subsection (s); and therefore the petition of the Bank, that the ex parte order of the court adjudicating the debtors bankrupts in accordance with subsection (s) should be rescinded, and that the debtors' petitions under section 75 of the Bankruptcy Act, as amended (title 11, U.S.C.A. § 203) should be dismissed, must be granted. The debtors may, of course, voluntarily avail themselves of the ordinary bankruptcy law. Counsel should submit the appropriate orders in due course.