**In re BREWSTER et al.**

No. 5570.

District Court, W. D. Louisiana, Shreveport Division.

May 29, 1937.

Albert P. Garland and Harry V. Booth, both of Shreveport, La., for debtor.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, La., for creditor First Nat. Bank of Shreveport.

E. W. Browne, Conciliation Commissioner, of Shreveport, La., and C. T. Munholland, Supervising Conciliation Commissioner, of Monroe, La., for conciliation commissioner.

DAWKINS, District Judge.

This is a proceeding under section 75 of the Bankruptcy Law, as amended, known as the farmers' bankruptcy section (11 U.S.C.A. § 203).

On October 22, 1935, a petition, praying that the debtors be allowed to offer a proposal for an extension or composition of their debts, was presented to and approved by the court as properly filed. The attached schedule showed assets valued by the debtors at $7,209 and debts aggregating $42,746.73, as follows:

Secured debts.................$26,824.69
Unsecured debts...............$11,922.04
Indorsements .................$ 4,000.00
                             ―――――――――――
            Total             $42,746.73

At the same time, it having been made to appear that certain property of the debtors was under seizure in the state court of Caddo parish, and about to be sold in foreclosure of mortgages thereon, it was ordered that those proceedings be stayed until the further orders of the court. The cause was then referred to the conciliation commissioner for Caddo parish. Hearing was had on January 16, 1936, at which the debtors "proposed to the creditors that they be granted an extension on their debts of three years, they to pay legal interest on the secured obligations at the end of the first and second years, from date, the entire debts with remaining interest to be payable three years from date, or on January 16, 1939."

The debtors were examined and it appeared that one of them, Curtis Brewster, had moved on and commenced farming one of the tracts, consisting of 70 acres, in 1927, and has continued to do so since that time; that W. O. Brewster had assisted in the farming of the same tract during the "past several years" except for two years, when he was employed by the city of Shreveport; and that Brew-Nell, Inc., was a "holding company" for the other two debtors.

Certain proofs of claims were filed and the hearing was adjourned until January 30, 1936, at which time the commissioner was to "consider confirmation of the extension"; but that this hearing was later postponed by consent until February 20, 1936. On the date last mentioned, sixty-three of the creditors, whose claims had been allowed, and aggregating $28,079, voted in favor of the extension, and the meeting was again adjourned until March 5, 1936, at the request of the First National Bank, largest secured creditor. On the last-mentioned date there was voted against the proposal claims of said bank amounting to $24,439.72. On March 16, 1936, the commissioner, having found that $28,029 in amount and a majority in number had voted in favor of the proposal, and only $24,459.72 had voted against it, entered an order in which he decreed that "the application to confirm said composition or extension proposal must be, and is hereby granted, and, accordingly said proposal is hereby confirmed."

Counsel for the First National Bank filed exceptions to the report, and at the same time asked that the cause be remanded to the commissioner. The court referred the matter to the supervising conciliation commissioner for this district, who held a hearing thereon at Shreveport, at which the parties appeared, testimony was taken and thereafter recommended that the case be remanded to the conciliation commissioner for Caddo parish. No objection having been made to this report, after the lapse of more than ten days and notice to the debtors, the entire case was reopened and remanded.

A hearing upon the remanded proceeding was had on October 5, 1936, at which the debtors amended their proposal by offering "to pay all unsecured creditors 5% interest on the principal amount of their claims within one year from the date on which the proposal is confirmed by the court, with interest at a like rate at the end of the second year, the entire claims to be paid in full at the end of the third year, with 5% interest thereon; and to pay the secured creditors 8% interest on the principal amounts of their claims at the end of one year; with like interest at

the end of two years, and payment in full at the end of three years, with interest at the same rate." On the motion of the debtors the meeting was then adjourned until October 14, 1936, and on the latter date, some of the creditors not being ready to vote, it was again adjourned until October 27th.

On October 27, 1936, a vote was again taken, from which the commissioner found that a total of $28,598.12 voted against the proposal and only $21,467.76 voted in favor of it, which he found had been rejected by a majority of $7,130.36, and which was later increased to $9,716.38, he having failed to allow on the claims of the First National Bank 10 per cent. attorney's fees.

The debtors filed a motion to remand the matter to the supervising conciliation commissioner and that "he be instructed to order a hearing upon the facts alleged upon," and in the alternative, that it be referred back to the commissioner for Caddo parish, "with instructions, first, to serve copy of his report or reports of November 23rd and November 30th, 1936, upon petitioners; second, to permit petitioners to file such proceedings before him as they may be entitled to file under the provisions of subsection (s) of section 75 of the Bankruptcy Law [11 U.S.C.A. § 203(s)] and procedure affecting this class of litigation; and, third, that he be instructed to permit your petitioners to file in particular such objection or objections to said report."

This petition recites the proceedings detailed hereinabove as to the first and second hearings before the commissioner for Caddo parish, as well as the reports filed by him; that petitioners had no notice of the decision of the commissioner until December 3, 1936; that they have never been furnished with a copy of the official report; that they have been deprived of due process of law and have been deprived of the benefits of subsection (s) of section 75 of the Bankruptcy Law, as amended, 11 U.S.C.A. § 203(s), by reason of the failure of the commissioner to have officially notified them or their attorneys of his action, and to have furnished them or their attorneys with a copy of the official report and recommendation, and that if remanded other creditors would vote in favor of their proposal sufficient to have it accepted. Further, that at the present time there is only one creditor out of almost sixty that will oppose petitioners' extension of time within which to pay their debts.

The debtors have also filed exceptions to the report, as follows: (1) The commissioner failed to notify the debtors of the filing of his report with the supervising conciliation commissioner; (2) that the supervising conciliation commissioner filed the report with the court without the debtors having had an opportunity to file such "objections, exceptions and pleas" as they would have done had it been served upon them or been notified thereof; (3) that, at the second hearing before the commissioner for Caddo parish, the debtors objected to the allowance and voting of the claim of the First National Bank on the following grounds: That the notes forming the basis of its claim were payable to City Savings Bank & Trust Company, one of which had never been indorsed and the other had been indorsed over to Reconstruction Finance Corporation, and the First National Bank had not, and could not, show any lawful title in itself to said notes; that these objections were overruled by the commissioner and to which ruling the debtors' counsel had excepted and reserved their right to urge the matter before the court; (4) that the commissioner, in his amended report, had allowed attorneys' fees on the two notes representing the claims permitted to vote against the proposal.

The prayer of the pleading was that the exceptions be sustained, the report be rejected, and the cause again remanded to the commissioner, with instructions to rehear the matter and take a new vote of the creditors on the proposal.

The First National Bank and the Reconstruction Finance Corporation have appeared in a joint motion and moved to dismiss the entire proceeding on the ground that the petition for relief was not filed in good faith, was not feasible, and could not bring about rehabilitation for the debtors; that the total of the two claims of the First National Bank, as shown by the commissioner's report as of November 30, 1936, was $28,446.29; that the Reconstruction Finance Corporation had in August, 1935, instituted foreclosure proceedings against the debtors on notes for $2,508.05 and $17,500, respectively, which were held by it as collateral; that they were entitled to have the property seized and sold to discharge said indebtedness and to purchase the same in satisfaction there-

of; that said proceedings were stopped by the original orders of this court, approving the petition of the debtors, since which time no payments have been made, and the First National Bank had been compelled to pay the taxes for several years; that the fair market value of the property has at all times during the present proceedings been less than the amount of the indebtedness due petitioners, and this difference has increased by the accumulation of interest and nonpayment of taxes by the debtors. Further, that petitioners had filed an offer in writing to "accept in full payment of the amount of the indebtedness due them the mortgaged property and to waive any deficiency judgment, if permitted to continue the foreclosures."

### On the Motion to Remand.

■ (1) It is my view the complaint that the debtors were not notified or furnished with copies of the commissioner's reports that the proposal had failed of approval presents no serious issue, for the reason they could and did urge all objections thereto which might have been done if notified. It would have been better practice to notify both the debtors and creditors at the time of filing such reports, but would not be practicable to furnish every one with copies thereof, especially where the creditors are as numerous as in this case.

■ (2) Neither do I think the debtors have been prevented from availing themselves of the benefits of subsection (s) of section 75 of the act, if entitled to do so. If their exceptions are overruled and the motion to remand denied, I can see no reason why they might not ask to be adjudged bankrupts under that provision, unless the court should find that the proceedings should be dismissed as is prayed for by the opponent bank.

(3) With respect to the allegation that other creditors will vote in favor of the proposal, if remanded, this will be disposed of by rulings upon the exceptions to the reports and the motion to dismiss.

### On Exceptions by the Debtors to the Commissioner's Report.

■ Paragraphs 1 and 2 of the exceptions have reference to the failure to give notice and furnish debtors with copy of the reports, which have been disposed of in the ruling upon the motion to remand. The exceptions otherwise deal with the holding of the commissioner permitting the First National Bank to vote the claim filed by it, including attorney's fees stipulated in the notes forming the basis of these claims. These notes, in the sum of $2,508.05 and $17,500, respectively, were both payable to the City Savings Bank & Trust Company, the first bearing no indorsement and the second having been indorsed over to the Reconstruction Finance Corporation. Counsel for the debtors objected to their being voted by the First National Bank of Shreveport for the reason it had no title thereto. Thereupon the City Savings Bank & Trust Company and the Reconstruction Finance Corporation filed, through the same attorneys who represented the claimant bank, formal disclaimers of ownership in the notes. The commissioner held that this, together with the actual possession of the notes, supported by the affidavit of ownership by the First National Bank, was sufficient to establish title in it for the purpose of voting in this proceeding, and that the argument and authorities cited by attorneys for the debtors, were only applicable in a contest of title to or some interest in the notes. In this ruling I think he was correct.

■ As to the contention that the bank should not have been permitted to include attorney's fees in the amount of its voted claims, it is sufficient to say that the same thing was done in many other instances of claims voting for the proposal, and if the objection was sound the result would not be changed, for the commissioner found the opposing votes exceeded the favorable ones some $7,000, not including these attorney's fees.

### On Motion to Dismiss.

■ As stated in the beginning of this opinion, the schedules of the debtors place a value of $7,209 on their assets with an indebtedness of $42,746.73, $4,000 of which is listed as "indorsements." No appraisement other than the figures named in the schedules was made, and it may be assumed for the purposes of the case that the assets have no greater value than stated, although the total assessed value shown on the schedules was $16,644. They consisted solely of real estate in nine tracts, amounting to 680.90 acres; 70 acres were being cultivated by one of the debtors, Curtis Brewster, in which the other individual debtor, W. O. Brewster, had some kind of interest. The Brew-Nell Company is merely a holding company for the individuals and has no other assets or

creditors. Three separate foreclosures had been filed in the state court at the beginning of this proceeding, being cases Nos. 66996, Reconstruction Finance Corporation v. Curtis Brewster, 66995, Reconstruction Finance Corporation v. William O. Brewster, and 66994, Reconstruction Finance Corporation v. William O. Brewster, on the docket of the First judicial district court of Caddo parish. These suits were upon the same claims now asserted in this proceeding by the First National Bank, and involved the seizure of four tracts, aggregating 251.87 acres, out of the total of 680.90 acres, and the opponent offered to accept the property so mortgaged in full settlement of its claims, without taking deficiency judgments, which was refused.

The first proposal of the debtors, as above stated, was to pay "legal interest from date on the secured obligations, at the end of the first and second years— the entire debts, with remaining interest, to be payable three years from date, on January 16, 1939." After this cause was remanded, the proposal was amended by offering to pay "all unsecured creditors 5% on the principal amount of their claims within one year from the date on which the proposal is confirmed by the court, with interest at a like rate at the end of the second year, the entire claim to be paid in full at the end of the third year, with 5% interest thereon; and to pay the secured creditors 8% on the principal amount of their claims at the end of one year, with like interest at the end of two years, and payment in full at the end of three years, with interest at the same rate." I think the record conclusively shows that the debtors have no reasonable prospects of meeting even the interest payments on their indebtedness. According to their own figures, the secured debts, at the filing of the petition for relief on October 22, 1935, amounted to $26,824.69, upon which interest at the rate of 8 per cent. would amount to $2,145.92, and on the unsecured debts of $11,922.04, at 5 per cent. would be $596.10, or $2,742.02, while if the indorsements of $4,000 had to be met at only 5 per cent. interest (being notes they probably bore 8 per cent.), would add $200 more, or require a total of $2,942.02 annually to meet interest alone. This, of course, would be considerably increased by figuring in the accrued interest and attorney's fees. According to the commissioner's report, creditors with claims amounting to $21,467.76 voted for the

proposal, while the amount voted against it was $28,598.12, and to which his supplemental report added another $2,586.02 (attorney's fees on the claims of the First National Bank) making a grand total of $52,561.90, which would require approximately $3,500 annually for interest.

Neither of the individual debtors nor the corporation have any income or existing sources from which they could expect to meet the requirements of the proposal, other than the revenues from their farming operations. This has never amounted to as much as $800 per year over living expenses. As above stated, only a small portion of the land,—some 70 acres,—is in cultivation. W. O. Brewster has at times made some money trading, and he stated that he expected to meet yearly payments of the interest and finally discharge all of the principal of the claims by trading in oil leases, although he had nothing definite in view. His brother, Curtis Brewster, has been dependent for several years upon the farm alone for support.

In an attempt to secure the approval of a sufficient amount of claims to overcome those of the opponent bank, the debtors made some kind of an agreement, the exact nature of which was not disclosed, with their brother-in-law, H. T. Fussell, by which the latter, through a representative, accompanied by one of the debtors, went around and bought up a large number of claims, some of which appeared to have prescribed but which the debtors claim to have acknowledged. A computation made by a bookkeeper for the commissioner showed Fussell had acquired a total of $14,486.96 for the sum of $493.86, or at the rate of .0341 of their face value, or 5 per cent. approximately of their original amounts. The number thus acquired were fifty-five out of a total of sixty odd against the estate. With respect to the arrangement made with the brother-in-law, W. O. Brewster testified as follows:

"Q. Have you made any promises to pay any of these debts which Mr. Fussell has purportedly purchased?

"By Mr. Garland: Objected to as it is not an issue in this case, nor presented by any pleading.

"By Mr. Dawkins: I think the question of good faith in the entire transaction is at issue.

"By the Commissioner: The witness will be permitted to answer the question

as throwing some light upon the transaction.

"A. You mean any debts assigned to Mr. Fussell, have I made any promise to pay him?

"Q. Yes. A. I have made promises to pay him, yes.

"Q. What percentage of these debts have you agreed to pay him? A. I told him I would settle the debts when and if I got out of this trouble.

"Q. You intend to pay them in full, their face value? A. Whatever arrangement we make at the time—I left that entirely up to him."

While I can see nothing improper in a debtor appealing personally to his creditors to vote for his proposal, without promise of any consideration therefor, or advantage over other claimants, this is a very different thing to purchasing those claims outright, either himself or through another, under circumstances giving him control of them to the prejudice of other creditors. The situation thus created has every reasonable appearance of plain discrimination of those whose claims were so purchased, since it seems most probable that the others will receive nothing. However, regardless of the legal consequences, it seems that the condition of these debtors is so utterly hopeless from the standpoint of their being able to carry out their proposal the court is bound to conclude it was not made in good faith.

In Wright v. Vinton Branch of Mountain Trust Bank of Roanoke, Virginia et al., 300 U.S. 440, 57 S.Ct. 556, 562, 81 L.Ed. 736, handed down on March 29, 1937, the constitutionality of section 75 of the Bankruptcy Act, as amended, 11 U.S.C.A. § 203 (known as the Frazier-Lemke Act) was sustained. In doing so the court said: "Paragraph 3 also provides that 'if * * * the debtor at any time * * * is unable to refinance himself within three years,' the court may close the proceedings by selling the property. This clause must be interpreted as meaning that the court may terminate the stay if after a reasonable time it becomes evident that there is no reasonable hope that the debtor can rehabilitate himself within the three-year period."

In a footnote appended we also find the following by the court: "This construction is in harmony with the requirement of good faith in the initiation of proceedings under Section 75. Relief under Section 75(s) may be obtained only by one who has made a bona fide attempt, and has failed, to effect a composition under Section 75, (a) to (r), 11 U.S.C.A. § 203(a–r). The offer of composition must be in good faith (Sec. 75, (c), (i), 47 Stat. 1471, 1472), and if the debtor is beyond all reasonable hope of financial rehabilitation, and the proceedings under Section 75 cannot be expected to have any effect beyond postponing inevitable liquidation, the proceedings will be halted at the outset. The practical administration of Section 75 in the lower courts already affords ample evidence of the substantial protection afforded the creditor by this requirement of good faith in the initiation of proceedings under subsections (a)–(r). See In re Borgelt (C.C.A.) 79 F.(2d) 929; Dallas Joint Stock Land Bank v. Davis (C.C.A.) 83 F.(2d) 322, 323; Steverson v. Clark (C.C.A.) 86 F.(2d) 330; Knotts v. First Carolinas Joint Stock Land Bank (C.C.A.) 86 F.(2d) 551; In re Reichert (D.C.) 13 F.Supp. 1, 4, 5; In re Paul (D.C.) 13 F.Supp. 645, 647; In re Buxton's Estate (D.C.) 14 F.Supp. 616; In re Vater (D.C.) 14 F.Supp. 631; In re Schaeffer (D.C.) 14 F.Supp. 807; In re Duvall (D.C.) 14 F.Supp. 799; In re Byrd (D.C.) 15 F.Supp. 453; In re Wylie (D.C.) 16 F.Supp. 193, 194; In re Price (D.C.) 16 F.Supp. 836, 837. Compare In re Chilton (D.C.) 16 F.Supp. 14, 17; In re Davis (D.C.) 16 F.Supp. 960. It must be assumed that the situation of the present debtor was not beyond all reasonable hope of rehabilitation, else he could not have qualified to file his petition at the outset. Compare Tennessee Publishing Co. v. American National Bank, 299 U.S. 18, 22, 57 S.Ct. 85, 81 L.Ed. 13."

Subsection (i), section 75 of the statute itself (11 U.S.C.A. § 203(i) provides: "The court shall confirm the proposal if satisfied that (1) it includes an equitable and feasible method of liquidation for secured creditors and of financial rehabilitation for the farmer; (2) it is for the best interests of all creditors; and (3) the offer and its acceptance are in good faith, and have not been made or procured except as herein provided, or by any means, promises, or acts herein forbidden."

Of course, in the present instance, the proposal was not accepted by the required majority, and the court is not confronted with the question of approving it. However, information as to its nature and the other circumstances above

mentioned could not be developed or brought to the attention of the judge until the hearing and report of the commissioner. The court assumed in the beginning that the petition was filed in good faith. As further bearing upon the question of good faith, it is well to note that under the last proposal the three-year extension is not to commence and the payments of interest do not begin until it has been finally approved by the court. As previously stated, this proceeding was filed on October 22, 1935, and it seems obvious the debtors wished to take advantage of this delay without paying anything. Some of the land in question is said to be in the proximity of Cross Lake, near the city of Shreveport, and the only possible chance for the debtors to gain anything by delay is through enhancement of its value. This I do not believe justifies the court in tying the hands of creditors in the manner and under the conditions sought by the debtors and that the proceedings should be dismissed as not being feasible for the rehabilitation of the debtors and as not having been filed in good faith.

Proper decree should be presented.