**MASSEY v. FARMERS & MERCHANTS NAT. BANK & TRUST CO. OF WINCHESTER, VA., et al. (four cases).***

**SAME v. C. L. ROBINSON ICE & COLD STORAGE CORPORATION OF WINCHESTER, VA.**

Nos. 4269, 4292–4294, 4297.

Circuit Court of Appeals, Fourth Circuit.

Feb. 2, 1938.

Robert H. McNeill, of Washington, D. C. (John W. Cleaton, of Washington, D. C., Raymond E. Perrine, of Winchester, Va., and Harold C. Dalaker, on the brief), for appellants.

B. P. Harrison, of Winchester, Va., for appellee Farmers & Merchants Nat. Bank & Trust Co.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The appeals in these cases question the correctness of certain orders of the District Court whereby petitions filed by Elizabeth E. Massey, a debtor, under section 75 of the National Bankruptcy Act, as amended, 11 U.S.C.A. § 203, were dismissed on the ground that they were lacking in good faith and did not justify the extensions of credit which she sought. Mrs. Massey is the owner and operator of 106 acres of land near Winchester, Va., comprising 90 acres of apple orchards, an apple candy plant, a homestead and woodland. On August 13, 1937, she filed a petition under section 75 in which she listed liabilities due creditors holding securities in the sum of $57,747 and assets of $60,800, consisting of the farm valued at $60,000 and certain machinery and equipment valued at $800. Subsequently, on September 30, 1937, amended schedules were filed in which the total debts were listed at $58,912.81. Included in this amount were secured debts as follows: A debt contracted on October 6, 1911, and extended from time to time secured by deed of trust on the farm in the sum of $16,400; a debt of $15,000 contracted September 1, 1914, subsequently enlarged and extended from time to time, secured by a second deed of trust on the farm in the sum of $30,947.47; and a crop lien of January 5, 1937, in the sum of $2,500, making an aggregate of se-cured debts of $49,847.47, all of which were due and owing the Farmers & Merchants National Bank & Trust Company of Winchester, Va. There were also listed unsecured debts in the aggregate sum of $9,055.-34, consisting of promissory notes due and owing other persons. Assets were listed in the amended schedules in the aggregate sum of $103,652.79, the excess over the value shown by the original schedules, consisting largely of an increase of $22,260 in the valuation of the farm, and the addition of $8,000 representing the estimated sales value of growing fruit which, being subject to a lien of $2,500, was not listed at all in the original schedule.

Upon the filing of the petition, the District Judge, reciting that the petition appeared to be in proper form and to have been filed in good faith, see Bankruptcy Order 50, subd. 2, 11 U.S.C.A. following section 53, referred it to a conciliation commissioner as contemplated by the act; and restrained the bank from proceeding with a sale of the farm which had been advertised to take place on August 14, 1937. Subsequent proceedings are shown by a report and memorandum of the conciliation commissioner filed in the District Court on October 15, 1937. The first meeting of creditors was held on September 9, 1937, at which the bank was represented by counsel and the debtor was represented by counsel and by her son Carl F. Massey who had had active management of the debtor's business for a number of years; and it was agreed that the son was qualified to speak for his mother, who was then eighty-four years of age, and that she would be bound by his statements. A proposal for the extension of the debtor's obligations was submitted and the debtor's son was examined with reference thereto; but it was rejected by the bank holding a majority of the indebtedness. It did not appear to the conciliation commissioner, from the evidence presented by the son, that there was "any probability of the debtor making any proposal which bona fide had any chance of being accepted by the creditors"; but the commissioner, being of the opinion that if more time were given, an agreement with the creditors might be reached, called a second meeting of the creditors for September 30, 1937. At this meeting the amended schedules were filed, and an amended proposal was submitted by the debtor which was, however, substantially the same as the first. It was rejected by the creditors for the reason that no

showing was made that the debtor could carry it into effect. The conciliation commissioner examined the debtor and reached the same conclusion, but nevertheless granted another extension of time for further negotiations.

A third meeting of the creditors was held by the commissioner on October 11, 1937, at which time affidavits of the debtor and her son were submitted to the effect that the debtor was carrying on negotiations with two commercial financing companies with a view of a complete refinancing of the debtor's property, and that both companies were giving favorable consideration to the proposed transactions, and a further extension of six weeks in order to make a definite report to the commissioner was requested. The son was again interrogated by the commissioner and the extension was refused since no substantial or concrete showing was made that there was any probability that the debtor would reach an agreement with the creditors. The commissioner filed a report to this effect in the District Court on October 15, 1937.

Summarizing his findings, the commissioner pointed out that it was made plain to the debtor at the first meeting of creditors that no plan would be acceptable to them which provided for the relinquishment by them of any substantial legal right; that the amended proposition submitted at the second meeting was nevertheless subtantially the same as that presented at the first, and that there was no evidence whatsoever of its feasibility, since it was based upon a number of contingencies which were, to say the least, remote; and that no evidence to alter the situation was presented at the third meeting of creditors with the result that the repeated requests for extensions of credit "bordered close to bad faith on the part of the debtor." Specifically the commissioner pointed out that at the third meeting of creditors the debtor did not disclose the names of the persons with whom negotiations for refinancing the business were being conducted or give any assurance of ultimate success except to say that "both companies are giving favorable consideration and interest to the proposed transactions." The commissioner therefore reported to the court that the debtor had failed to make a bona fide, clear, concise, and definite proposal to the creditors supported by facts and capable of being carried out. The District Judge accepted the report of the commissioner and ordered that the peti-

tion and all proceedings thereunder be dismissed with the right to the creditors to proceed as they might be advised.

An examination of the proposals submitted by the debtor's son and of his testimony discloses ample support for the commissioner's findings. The first proposal submitted provided for the payment by the debtor on or before August 1, 1938, of the sum of $50,600 and of the additional sum of $6,000 on or before August 1, 1939. These sums were to be provided as follows:

1. $ 5,000  from the proceeds of the apple crop of 1937
2. 5,000  from a loan on the dwelling house on the farm
3. 5,000  from a loan to be made by Margaret E. Massey, the wife of Carl F. Massey
4. 10,000  from the sale of two by-product plants on the farm to a corporation being organized in Washington, D. C.
5. 9,600  from the sale of 1,200 feet of land fronting on the highway bordering the farm
6. 16,000  from refinancing the first mortgage on the property
7. 6,000  from the proceeds of the apple crop of 1938.

In the amended proposal it was provided that the bank should be paid $20,000 on or before January 2, 1938, upon the condition that the bank should release from the lien of its mortgages 6 acres of land, comprising the site of the buildings, and 530 feet of road frontage. This part of the amended proposal was substantially a repetition of items 2, 3, and 4 of the original proposal. The amended proposal also provided for the assignment to the bank of the entire proceeds of the 1937-8 apple crops, being a repetition of items 1 and 7 of the original proposal. It was also proposed that the debtor on or before January 2, 1939, should refinance and pay off in full all of the moneys due the bank; and should pay the interest annually on the unsecured debts and the entire principal thereof on or before January 2, 1940.

The testimony, however, did not indicate any reasonable assurance on the part of the debtor or her son that the moneys promised would be forthcoming when needed. There was indeed testimony tending to show that the estimated proceeds of the apple crops were comparable with prior experience; but there was no evidence that the loan of

$5,000 on the dwelling house and its curtilage could be actually secured "through relations in Minnesota," or that the daughter-in-law, against whom there were outstanding unpaid judgments in the aggregate sum of $35,000, would make a loan of $5,000 to the debtor, or that the road frontage, without provisions for roads or sewers or water, would be salable on a front foot basis in a real estate development within the year, or that there was any probability of the sale of the by-product plants for the sum of $10,000, the only evidence in this respect being that negotiations for the sale were being conducted with a Mr. Whittier of Washington, D. C.; or that it was possible to secure the sum of $16,000 by refinancing the first mortgage, the son merely testifying that he proposed to get the money from the Federal Land Bank of Baltimore. Nor was there anything more than a promise that the overdue obligations held by the unsecured creditors would be paid as contemplated in the amended plan. In no instance was it shown that the money promised by the debtor could actually be obtained from the indicated source.

It will have been noticed that although the delay, secured on the eve of the public sale of the property on August 13, 1937, had been extended for two months by the proceedings above described, no progress had been made by the debtor in refinancing the business. The report of the conciliation commissioner was filed in court on October 15, 1937, and lay there until November 5, 1937, when the District Judge of his own motion, noting that the debtor had taken no further steps, ordered that her petition and all proceedings thereunder be dismissed, with the right in the creditors to proceed as if the petition had not been filed. On November 27 the debtor petitioned the court to reinstate the proceedings, alleging that the dismissal had taken place without notice to her, and that before the dismissal an extension agreement had been substantially agreed upon between the debtor and her creditors, and that on November 11, 1937, a definite working agreement, drafted by the bank and one of the unsecured creditors, had been substantially accepted by the debtor. No such agreement, it is conceded, was ever accepted by the debtor; and the judge for reasons to be stated hereafter denied the petition. From this action the appeal in case No. 4292 was taken.

On the same day, November 27, 1937, subsequent to this denial the debtor filed an amended petition reciting that she had previously filed a petition under section 75 and had failed to secure from her creditors an acceptance of the proposal she had made for an extension of her indebtedness and that she therefore desired to obtain the benefits of section 75 (s) of the act, as amended, 11 U.S.C.A. § 203(s), making use of the schedules previously filed. This petition after hearing was denied by order of December 17, 1937. The District Judge upon a consideration of all the facts of record in the prior proceeding reached the conclusion that the debtor had not made any bona fide offer to her creditors and that such an offer is a condition precedent to the right to file an amended petition under section 75 (s). In part the court said:

"When we consider the so-called offers of extension made by the debtor in this case in the proceedings before the conciliation commissioner we find that they are vague, indefinite and largely meaningless. The first proposal simply suggests that the debtor may be able to negotiate certain loans and sell certain property at estimated figures, the proceeds of which she will apply to her debts, but gives no assurance that this will be done and does not indicate what efforts are being made to accomplish it. In the so-called amended proposal, the debtor, as to the larger part of her indebtedness, merely says that she will pay off the debt at times varying from 15 months to 28 months in the future without the slightest reference to how this is to be done. Both proposals are contingent upon the surrender by the principal creditor of rights which no reasonable man could be expected to agree to. Neither proposal provides for the upkeep or protection of the property upon which the debts are secured or for the payment of taxes or of current interest on the indebtedness.

"This case was before the conciliation commissioner for two months during which time he held repeated meetings of the debtor and her creditors. He made every effort to procure from the debtor a tangible and reasonable offer of extension without avail. Certainly these so-called offers by the debtor do not show a bona fide effort to reach an agreement with her creditors. It is no wonder that the conciliation commissioner, after the lapse of two months marked by the apparently calculated efforts of the debtor to drag out the proceedings as long as possible, felt called upon to express the opinion, as he did in his report, that the debtor was

not acting in good faith. With this view I concur. Neither can I relieve myself of the impression that since the commissioner's report was filed there has been a studied effort at delay. The failure to take any steps following the commissioner's report thereby evidencing a desire that the case simply remain on the docket with no action being taken, the waiting for three weeks or more after the proceedings had been dismissed before filing the petition to reinstate, the fact that reinstatement would simply have furnished occasion for further delay, all of these were, in my opinion, for the purpose of keeping this matter before the court as long as possible and thereby postponing the day when the debtor must make a real effort to pay her debts.

"It is the conclusion of the Court that the debtor has never made any bona fide effort to agree with her creditors on a composition or extension and is not entitled to proceed under subsection (s). The prayer of the amended petition for adjudication in bankruptcy and for the rights and privileges accorded by subsection (s) will be denied and the amended petition dismissed."

From this action the appeal in case No. 4297 was taken.

■ The debtor charges that it was error on the part of the court to affirm the findings of the conciliation commissioner and dismiss the petition in case No. 4292 without notice to her. It would no doubt have been proper practice upon the filing of the report to have notified the debtor to show cause on or before a certain date, if any she had, why the report should not be approved and the debtor's petition dismissed. But we cannot say that it was error to follow the course which the court pursued. The filing of the report of the commissioner, of which the debtor was bound to take notice, took place on October 15, 1937, and it was shown therein that the debtor's petition had not been filed in good faith. Thereafter twenty-one days elapsed (during which interval the debtor took no exceptions to the report) before the report was accepted and the petition dismissed; and in the meantime the order restraining the bank from taking action upon its claims remained in effect. The court was therefore justified in putting an end to the proceeding in the absence of any controlling statute or rule of court to the contrary.

■ We know of no such statute or rule. Section 75 (a), as amended, 11 U.S.C.A. §

203(a), provides that the conciliation commissioner shall have the qualifications of a referee in bankruptcy; and the report of the commissioner may therefore be reasonably held to come within the purview of General Order in Bankruptcy No. 47, 11 U.S.C.A. following section 53, which provides that the reports of referees in all proceedings under the act shall be deemed presumptively correct but shall be subject to review by the court, no period being set within which exceptions may be filed. No attempt has been made to regulate the practice in this respect under General Order No. 50, 11 U.S.C.A. following section 53, relating to proceedings under section 75 of the act. In the absence of more specific directions, it has been held that an application to review the findings of a referee must be made within a reasonable time. 8 Remington on Bankruptcy, 3d Ed. § 3659; In re Universal Rubber Products Co., 3 Cir., 28 F.2d 253. Twenty days is specified by Equity Rule 66, 28 U.S.C.A. following section 723, as the period within which parties may file exceptions to the report of a master, failing which the report is to stand confirmed. While it has been held that the equity rules do not control the procedure in bankruptcy, International Harvester Co. v. Carlson, 8 Cir., 217 F. 736; In re Hughes, 2 Cir., 262 F. 500; Bradley v. Huntington, 2 Cir., 277 F. 948; Oakland Hotel Co. v. Crocker First Nat. Bank, 9 Cir., 85 F.2d 959; Daniel v. Guaranty Trust Co., 285 U.S. 154, 163, 164, 52 S.Ct. 326, 328, 329, 76 L.Ed. 675, nevertheless Equity Rule 66 furnishes evidence that the action of the court in the pending case was neither precipitate nor unreasonable.

It is noteworthy that in the pending case the debtor filed no objection to the report of the conciliation commissioner until November 27, 1937, six weeks after the report was filed and three weeks after it was confirmed by the District Judge. Moreover, it cannot be said that the debtor had no opportunity to present her views before the case was finally disposed of, because the petition to reinstate the case (No. 4292) and the amended petition for adjudication under section 75 (s) (case No. 4297) were filed on the same day and while the former was promptly dismissed, the latter was taken under consideration by the District Judge. Counsel had an opportunity to be heard and an opinion was filed on December 17, 1937, in which the facts were discussed on their merits and the absence of good faith was

noted that was as essential to the maintenance of the original as of the amended petition. The debtor was not denied an opportunity for a fair hearing.

We are also of the opinion that the action of the District Judge in dismissing both petitions was in harmony with the decision of the Supreme Court in Wright v. Vinton Branch Bank, 300 U.S. 440, 462, 57 S.Ct. 556, 561, 81 L.Ed. 736. It was there said that the benefits of section 75 (s) may be obtained only by one who has made a bona fide attempt, and has failed, to effect a composition under section 75 (a) to (r), 11 U.S.C.A. § 203 (a–r); and that the offer of composition must be in good faith, and if the debtor is beyond all reasonable hope of financial rehabilitation and the proceedings under section 75 can have no effect beyond postponing inevitable liquidation, the proceedings will be halted at the outset. See, also, Steverson v. Clark, 4 Cir., 86 F.2d 330. On this phase of the case the District Judge said:

"The term 'good faith' is here used as it has been used and applied in various cases arising under this statute, Wright v. Vinton Branch Bank, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736; In re Borgelt, D.C., 10 F.Supp. 113; Id., 7 Cir., 79 F.2d 929; In re Schaeffer, D.C., 14 F.Supp. 807; Knotts v. South Carolina, etc., Bank, 4 Cir., 86 F.2d 551; In re Reichert, D.C., 13 F.Supp. 1; In re Price, D.C., 16 F.Supp. 836. Debtors who invoke the provisions of section 75 for an opportunity to effect a composition or extension with their creditors must approach them in a sincere and honest effort to submit a proposal which offers a definite and reasonable method of liquidating the indebtedness and which can be expected to receive the consideration of reasonable men. Debtors who purport to offer terms of composition or extension merely as a preliminary step to taking later refuge under subsection (s) are not acting in good faith. The mere gesture of making some sort of an offer with no reasonable expectation that it will be accepted is not sufficient; nor is an offer based only on roseate but illogical hopes of what the debtor may, at some future time, be able to do. In the cases hereinbefore cited, and many others, the courts have had occasion to decide the conditions under which a debtor may proceed under subsection (s) and they are in unison in holding that he has no such right unless he has previously made a bona fide effort to agree with his creditors upon an extension or composition. Offers of composition or extension which offer no reasonable prospect of payment of the indebtedness, or which are vague and indefinite, or which are unreasonable in their treatment of the creditor, or which are contingent, or which are based on conditions improbable of fulfillment—all of these are held to be lacking in the good faith which should mark the efforts of a debtor to agree with his creditors.

"In the interpretation of this statute in Wright v. Vinton Branch Bank, 300 U.S. 440 at page 462, 57 S.Ct. 556, 562, 81 L.Ed. 736, Mr. Justice Brandeis, in a footnote to his opinion says: 'Relief under section 75 (s) may be obtained only by one who has made a bona fide attempt, and has failed, to effect a composition under section 75, (a) to (r).'"

In re Schaeffer, D.C., 14 F.Supp. 807, 811, appeal denied Schaeffer v. Federal Land Bank, 4 Cir., 84 F.2d 1012, Judge Chesnut says:

"It is thus seen that there are necessary conditions precedent to the right of the farmer debtor to avail himself of the mortgage moratorium provided by subsection (s). It seems quite clear from section 203 as a whole that the farmer must first have submitted to his creditors a proposal which 'in good faith contains an equitable and feasible method of liquidation for creditors,' and is for their best interests, as well as his own. Unless and until the farmer has made such a proposal which the court can subsequently find complies with these characteristics, subsection (s) is not available to him. And the principal contention of the Bank in this case is that these farmer debtors have not made such a proposal. In numerous federal decisions it has been held that subsection (s) is available to the farmer debtor only on the conditions above stated."

See, also, In re Borgelt, 7 Cir., 79 F.2d 929, at page 930, where, in affirming a refusal of the District Court to allow proceedings under subsection (s), the Appellate Court said:

"That subsection [s] presupposes a probability of eventual debt liquidation. It further presupposes a prior good faith effort on the part of the debtor to propose or accept a plan which is reasonably calculated to effect a debt liquidation. Here there was no bona fide plan presented by the debtors, and the conciliator after a hearing reported that fact to the court."

The adverse decision upon the appeals of Elizabeth E. Massey in cases Nos. 4292 and 4297 requires like action upon the appeals of Margaret P. Massey, in case No. 4269, Carl F. Massey in case No. 4293, and William P. Massey in case No. 4294. These three appellants are indorsers upon a note of $4,000 of Elizabeth E. Massey payable to one of her unsecured creditors; and Margaret P. Massey and Carl F. Massey are comakers of a note of $31,856 given to the bank as collateral security for a note of like amount of Elizabeth E. Massey payable to the bank and secured by deed of trust. Each of these appellants filed a petition alleging that he was secondarily liable upon an obligation of the debtor within the meaning of section 76 of the National Bankruptcy Act, as amended, 11 U.S.C.A. § 204, and praying that he might have relief under that section in connection with the original petition filed by the debtor under section 75, as amended, 11 U.S.C.A. § 203, for a composition or extension of her debts. These petitions were dismissed by the court on the ground, amongst others, that section 76 has reference to extension agreements entered into between the principal debtor and his creditors which have been approved and confirmed by the court as provided in section 75; and that the petition failed to show that such an agreement had been executed by the parties and approved by the court.

Section 76 provides in substance that an extension made pursuant to the provisions of section 75 shall extend the obligation of any person who is secondarily liable for, or who may have insured or guaranteed the debts of the principal debtor. These appellants contend that it was the intention of Congress by section 76 to give to persons, situated as they are, the benefit of all extensions which the principal debtor is entitled to receive under section 75, particularly the benefit of all extensions granted under subsection (s) of section 75. The appellee, on the other hand, contends that the correct construction is that the obligation of a person secondarily liable is not extended by the statute unless an agreement for the extension of the primary obligation has been accepted by a majority of the debtor's creditors in number and amount and has been approved by the District Judge under section 75 (a) to (r). It is, however, unnecessary to decide this controversy because even if it be assumed that the appellants' construction of section 76 is correct, they are not entitled to the relief prayed. Their petitions must fall with the petition of the primary debtor.

Nor is it necessary to pass upon the further contentions of the appellee that by reason of certain litigation in the state court, wherein the bank obtained a judgment on the note of $31,856 against Margaret P. Massey and Carl F. Massey, they are estopped from prosecuting their petitions in cases Nos. 4269 and 4293; nor upon the contention of the appellee that Margaret P. Massey and Carl F. Massey are primarily and not secondarily liable thereon to the bank.

·Affirmed.