**In re ANDERSON.**

District Court, D. North Dakota.
March 4, 1938.

E. R. Baird, of St. Paul, Minn., C. W. Lawrence, Jr., of Minneapolis, Minn., A. L. Quilling and E. E. Fletcher, both of St. Paul, Minn., Ivan V. Metzger, of Williston, N. D., for Federal Land Bank and Regional Agricultural Credit Corporation.

E. A. Tannas, of Crosby, N. D., for debtor.

Before NORDBYE and JOYCE, District Judges.

NORDBYE and JOYCE, District Judges.

It appears that debtor filed a proposal addressed to his creditors seeking composition and extension, which has been amended and was refused at the first meeting of creditors on August 27, 1937, when the motion for dismissal was denied. It further appears that on the 10th day of September, 1937, the petitioning creditors filed their petition for review. At the first meeting of creditors the debtor was examined and his testimony appears in the file. At that time the petitioning creditors sought dismissal upon the grounds that the same was not equitable, feasible, or a definite plan of debt liquidation for the best interests of all creditors and was not made in good faith within the meaning of said section 75, as amended, 11 U.S.C.A. § 203, and that the debtor had no hope or expectation of any eventual debt liquidation or financial rehabilitation, and that further proceedings under subsection (s) of section 75, as amended, 11 U.S.C.A. § 203(s) would be productive of nothing but delay and further loss to the creditors, and that the debtor had entered into these proceedings under the mistaken belief that by means of the proceedings secured debts may be scaled down against the will of secured creditors and without their acquiescence or consent and that the debtor has no interest in maintaining these proceedings nor any intention of attempting financial rehabilitation without the scaling down of secured debts. As indicated, this motion was denied by the conciliation commissioner. An exception was taken and the conciliation commissioner received for filing the debtor's amended petition under subsection (s) of section 75, as amended, 11 U.S.C.A. § 203(s), though no order for adjudication has been entered thereon.

In view of the record in this case and our conclusions thereon, its determination might well rest upon the decision in Re Palmer, 21 F.Supp. 628, an opinion by Judge Miller of the District Court of North Dakota, whose illness occasioned our assignment to the North Dakota District, which decision fixes the applicable law in cases of the type under consideration in that District. However, in view of the great number of cases submitted and considered by this court, aggregating over 130 petitions for review, and recognizing the conscientious and painstaking effort which all interested counsel have displayed in both argument and briefs, we have felt it fitting that we should give expression to our conclusions on the facts and our views on the law as applied thereto.

This case is one of a large group involving much the same situation in so far as the facts are concerned and substantially all are controlled by the same principles of law. It seems that counsel involved in many of these cases selected this debtor's proceeding as the one in which they wished to submit briefs, which have been filed by counsel representing the debtor and creditors, and we therefore shall take this case as the one in which we will file the within memorandum order.

It appears that the Federal Land Bank of St. Paul, Minn., and the Regional Agricultural Credit Corporation of Minneapolis, Minn., are secured creditors of the debtor Anderson, the Federal Land Bank having a loan on the debtor's farm which as filed and allowed amounts to $3,252.76. The Regional Agricultural Credit Corporation holds a chattel mortgage in the amount of over $1,200 covering personal property of the debtor, which he values at $200. The debtor's schedules list liabilities which, if there be included the Federal Land Bank past interest due, amount to $7,565.63, of which $291.09 represents past-due taxes and $493 unsecured claims. He lists total assets in the amount of approximately $900, which includes his farm of 160 acres which he values at $500. It appears that the lien on his real estate is six times in excess of the value which he has placed upon the land.

In this case the amended composition or extension proposal reads as follows:

"The undersigned, Christian J. Anderson, post office of Noonan, North Dakota, but a resident of the county of Divide and District aforesaid, the petitioner herein hereby makes the following proposal to his creditors:

"First: To creditors holding first real estate mortgage 50% of the balance due on principal of the mortgage, with interest on said offer, same as provided by the mortgage. That for the purpose of paying same, petitioner pledges, that he will farm the said land in good husbandlike manner, and that he will plant, with wheat, each year 80 acres. And will apply on said mortgage, one fourth of the crop the first year, and one-third of the crop the second and third year, and the balance, if any, at the end of three years, which he will pay out of his share of the crop and out of proceeds of livestock or any other money which the petitioner will be able to obtain.

"Second: To creditors holding first chattel mortgages petitioner offers to pay 30% of the balance due on principal, with interest on same, at the same rate as provided in the mortgage, and to pay one third of said offer each year, for three years out of proceeds of the secured property or out of his share of the crops, or any other money which he may be able to obtain.

"Third: And to creditors holding subsequent mortgages with security of no value, and unsecured creditors, he offers a compromise settlement 10%, of the balance left unpaid on principal with interest at the legal rate, same to be paid, one third each year, for three years. To be paid out of his share of the crop or from any other income he may have, or any other money that he is able to obtain.

"That in order to fulfill the obligations set out in the above, the petitioner fully agrees to do everything possible for the purpose of making the payments as set out herein. That he has farmed all his life, has no other business than farming, and the only offer, or agreement to pay his debts would be from the proceeds of his labor and farming operations. That he proposes to put in crops as above stated together with feed crops for the purpose of feeding livestock. And that he pledges proceeds of such livestock, and grain where ever raised, for the purpose of making said payments.

"Same to be applied as provided by law and directed by the court.

"The said petitioner prays that his proposal be submitted to his creditors in the manner provided by law, and if consented to and accepted by a majority of the said creditors in amount and number, that such other and further proceedings be had as are provided for by law.

"Dated this 18th day of October 1937.

"[Signed] Christian J. Anderson, Debtor-petitioner."

It may be observed with reference to the foregoing proposal that the mortgagee will participate only in a certain percentage of wheat which may be raised on the farm during the three-year period. If there are no crops or they prove insufficient to permit of complete liquidation of the offer as made, the farmer then agrees to pay the balance at the end of three years out of his share of crops or the proceeds of live stock, or from any other source available to him. The only live stock he owns, according to his testimony, is three horses, five cows, and three young stock. All stock is mortgaged. Even assuming the increase therefrom was not covered by mortgage, it is readily apparent that the proceeds to be derived from the sale of increase would be negligible. The securing of crops forms the entire basis of the proposal. The record indicates that he has had no paying crop since 1928. At present the debtor has no seed to plant a crop. Any money which may be advanced to him for the purchase of seed in the future by any governmental agency will obviously require the giving of a chattel mortgage as security on crops raised during the current year for which such advances would be made. The record shows obligations outstanding for seed and feed loans supplied by governmental agencies amounting to $1,160, no part of which has been paid. The record is silent as to the reasons that prompted the debtor to make an offer of $1,250—50 per cent. of the principal of the Federal Land Bank mortgage—to such mortgagee when his schedules indicate a value for the farm of only $500. The record discloses no source from which aid might come to this debtor from which the balance due could be paid should there be a failure of crops. Neither is there anything in the evidence which justifies the belief

that the debtor could accomplish the proposal within the three-year period when the showing made indicates that he has steadily gone backward during the past nine-year period.

The evidence shows that this loan of the Federal Land Bank was taken out in 1922 in the amount of $2,500; that the debtor now owes over $750 more than the face of the loan; that the terms of the mortgage were rearranged in 1934; that he has paid no taxes since that time. At the first meeting of creditors he was asked this question: "Have you got enough equipment and help so that you could farm all of the plow land on your place?" "A. Well, no, I haven't. I farmed until I am just about no good myself and machinery and horses and everything is shot." He testified further that he wanted to be sure there was plenty of rain before he would put in a kernel of seed. As to his buildings, he said: "The sun and the wind are just beating them up so we can look through them any place." He testified that he possessed three old horses, five cows, and three young stock; that he is milking some of the cows, but does not sell cream. He says his horses are not capable of working the farm but that he can rent the place out; that he has no seed for next year, has no tractor, though his boys have one and if it rains they will put in a crop for him; that he was going to quit and drive away because "I have lived in sand storms for years. Lots of days we had to take the family and drive away." He says that he has been receiving allotments on soil conservation "somewhere around $100 a year on that quarter, probably a little more." That he worked three months on WPA last fall and has been receiving some relief. He testified that unless his debts were adjusted enough he could not make good.

It is clear that under his proposal the farmer has nothing to lose and everything to gain, while, on the other hand, there is a strong probability that the creditor would lose if it entertained the proposal. If the drought continues, or if for any reason no crops are obtained, the creditor will have been delayed in its right to proceed under the terms of its mortgage. If bountiful crops are obtained, the creditor would be disposing of its security for a sum far less than the market value. If drought and other adverse conditions over which the farmer has no control cause failure, one might conclude that the creditor could not obtain anything more if possession had been turned over to him. But this court has no right to deprive a creditor possessing a legitimate claim from realizing on its security merely because it may happen that no particular benefit apparently will result to the creditor if possession be awarded him. If there is a probability that the creditor's rights will be seriously affected upon the happening of certain events or circumstances, this court cannot speculate as to whether such events or circumstances will take place. No authority is given to the court to gamble with the rights of creditors.

Does such proposal stamp the entire proceeding as one lacking good faith on the part of the debtor? Ordinarily, a composition offer in bankruptcy contemplates an offer to creditors of a settlement based on the present value of the bankrupt's assets. If the creditors will receive approximately as much by way of a composition as they could by liquidation, then it is assumed that the creditors will probably be attracted by the composition offer. It may be that, if this farm were sold today, it would be difficult to obtain any cash offer in excess of the value placed thereon by the farmer. If it were reasonably probable that the farmer could pay the sum of $1,250 with interest in three years, it may be assumed that the creditor would accept this proposal if it were of the opinion that farm values would be depressed for many years to come. The probability of the farmer's paying this sum in this period, however, is entirely speculative and conjectural. Taxes have been in arrears since 1934. No interest has been paid since that year. His ability to carry on farming operations successfully with his present farm equipment is questionable. The results of the debtor's farming operations between the date of the mortgage and the present are strikingly significant. In 1922 the present mortgage was $2,500, and instead of being reduced, it now amounts to a sum in excess of $3,250. Furthermore, it must be conceded that he has not a vestige of an equity in any of his property. Both real and personal property are mortgaged far in excess of their present value, and in all probability of any value for some years to come. No showing is made that the farmer is in a position to carry on normal farming operations during the coming year, but it is urged that the farmer in his present

condition could not make a more attractive proposal; that to require him to make a definite offer of so much cash each year is to demand the impossible, because he has no cash or any source from which he may obtain cash, except the hope that nature will be more beneficent to him in the future. "In the absence of facts to support hopes, there exists no sufficient support for a plan which postpones mortgagee's rights and remedies arising out of a past due secured indebtedness." In re Llewellin, 7 Cir., 86 F.2d 588, 590. It may be conceded that the farmer has made the best offer that his circumstances permit. The fact is that the dire distress of this farmer is so hopeless that he probably could not make any proposal to his creditors that he could fulfill that would be accepted. It may be that he has exhibited as much good faith in his offer as his financial condition and outlook will justify. He has not concealed any of his assets. He has apparently been open and frank in all of his disclosures to his creditors. It may be questioned, however, that good faith merely encompasses good intentions. "Good faith * * * means something beyond honest endeavor." See In re Dionne, D.C., 21 F. Supp. 311, 313. If the debtor's condition is so hopeless that it is evident he is not in a position to make any agreement with his creditors that holds out any possibility of acceptance, or if it is prompted only by a desire to remain in possession for some additional years in the hopeful expectation that possibly something will take place that will enable him to rehabilitate himself, it may be questioned that such debtor is in any position which will enable him to make a good faith offer such as the act contemplates. But, without characterizing the proposal as one lacking in good faith, it would seem that the nature of the proposal, its probability of fulfillment, and all the other circumstances as reflected in the record, should be considered in determining whether or not there is any probability of the debtor's attaining the purposes of the act if a three-year stay is entered, because if it appears that there is no probability or reasonable expectation that the farmer can rehabilitate himself, then these proceedings should be terminated at the outset. Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736.

█ █ It may be recognized that while the purpose of section 75(s) is not limited to the scaling down of the farmer's indebtedness, undoubtedly that may be the result if the farmer is able to pay the appraised value within the three-year period, and if the creditors do not request a sale at public auction. The farmer may obtain his property free from liens for a sum considerably less than the present encumbrances. To rehabilitate does not necessarily imply an ability to pay in full one's entire debt structure. It may be assumed that, if the appraised value fairly approximates the market value, the creditor would have no particular purpose in obtaining a sale at public auction. The farmer is in bankruptcy and the liens are worth no more than the value of the property to which they apply. Therefore, in interpreting the act one should not conclude that the farmer must be able to demonstrate to a certainty his ability to pay the liens in full during the three-year period in order to obtain the stay of proceedings. Nor does it necessarily follow that because of depressed, abnormal conditions the indebtedness exceeds the present value of the assets, the farmer has no right to seek the benefits of the act. Such a construction would deprive many worthy debtors of a reasonable opportunity to rehabilitate themselves. But where it appears that there is no reasonable probability of the farmer's being in a position to do anything more than tenuously to retain possession of the land for the three-year period, and at the end thereof to find himself more involved than at present, it would seem proper that the court should dismiss the proceeding. The purpose of the act cannot be to afford the debtor a place to reside for the next three years regardless of the hopelessness of his financial situation. If that be the object of the act, it clearly would be unconstitutional. In Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, on page 602, 55 S.Ct. 854, 869, 79 L.Ed. 1593, 97 A.L.R. 1106, Justice Brandeis said:

"If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public."

█ There must appear a reasonable probability that if given the benefits of the act, the debtor will be able to pay a reasonable rental, exercise good husbandry in the management of the operations of

the farm, and make suitable provisions to refinance himself, so that he can conserve his equities by either paying his secured creditors in full, or with their consent, the appraised value of his property. If the granting of a three-year stay cannot be reasonably expected to result in saving or preserving his equities in his real or personal property, then he cannot be considered as one who is able to rehabilitate himself. A fortiori, if he has no equities to preserve, and if it is extremely improbable that any equities will materialize during the three-year period, then there is nothing for the act to administer. In Pearce v. Coller, 3 Cir., 92 F.2d 237, 239, the court, among other things, said:

"The petitioner shows that the mortgage indebtedness is $9,000 on which no interest has been paid for five or six years and that the property is 'now worth about $5,000.' Consequently the petitioner has no equity whatever in the property. Accordingly there is no reason equitable or legal justifying the reversal of the decree of the District Court or a rehearing by this court."

Any allowance of a stay under subsection (s) with small or remote prospects of successful termination, in view of the present situation and past performance of the debtor, would be an arbitrary usurpation of the rights of creditors.

The court is not unmindful of the sacrifices made by this debtor and others who have waged this losing struggle against nature's seeming neglect, but one must frankly face the realities, and sentimental considerations, however impelling, will not justify an evasion of the evident purposes of the act. This court is conscious of the obligation resting upon it so to construe a statute as will permit the reflection of the legislative intent. It also recognizes the liberal spirit pervading the entire bankruptcy system in favor of the bankrupt, and such has been our approach to the matters presented in the many cases submitted. Each one has been considered and studied on its own facts and merits taken from the record made. If those facts in the great majority of cases prevent the application of the law, it results because neither Congress in the act itself, nor the United States Supreme Court in its interpretation thereof, permits relief in cases where all equity of the debtor is gone and a rehabilitation is clearly demonstrated to be hopeless.

The fact that the farmer has sustained a heavy loss does not mean that this court can require his creditors at this time to accept a proportionate loss. The mortgagee has the right under its mortgage, at least at the end of the three-year period, either to obtain this farm or the money that is due and owing it on the mortgage. If it is of the opinion that it can retain this farm for a period of years and obtain a greater return than it could if it now let the debtor have it at a depressed price, the court is in no position to prevent it from so doing. Whether this secured creditor will eventually obtain more from its security than the debtor can in time turn over to it, is not for the court to speculate upon. The fact remains that the entry of a three-year stay in this case under the circumstances disclosed would be a denial of the rights that this secured creditor has under and by virtue of its mortgage.

It may be suggested that this motion is premature and the mortgagee should defer any proceeding to dismiss until the debtor is functioning under section 75(s) and has actually entered upon the three-year stay, or it may be suggested that the debtor should be first afforded an opportunity to raise sufficient funds from some source in order to purchase his property from his creditors at the appraised value. However, this mortgagee has already indicated that it will not consent to a release of its security by accepting any appraised value less than the total amount of its indebtedness. But, regardless of the present attitude of the mortgagee, the court being convinced that there is no "rational prospect or hope of debtor's financial rehabilitation under any benefits to be conferred by the Frazier-Lemke Law" (In re Olson, D.C., 21 F.Supp. 504, 509), has no right to allow the entrance of a stay which will only have the effect of postponing inevitable liquidation. In short, we see no profitable purpose in permitting this debtor to invoke a three-year stay under the law in order to have determined a result which is clearly apparent today.

It should be noted that the Supreme Court in the Wright Case has given wide latitude to the right of the court to dismiss the proceedings when it appears that the debtor is unable to refinance himself within the three-year period. When the debtor has been unable to effect a composition or extension and it is evident that fu-

ture proceedings under subsection (s) will only result in liquidation, there can be no purpose in permitting the debtor to proceed further. If he has at this time demonstrated his inability to rehabilitate himself during the period of the three-year stay, it is idle to temporize with the situation. We conclude that a motion to dismiss on the grounds that the debtor cannot rehabilitate himself under the act may be made after composition or extension has been refused, and during the period the debtor is under subsections (a) to (r), or the creditor may urge such motion after the debtor has been adjudicated a bankrupt under subsection (s).

There are many cases supporting the foregoing views. Aside from those already cited, it may be helpful to direct attention to the views which other courts have expressed in this connection.

In Re Byrd, D.C., 15 F.Supp. 453, the court said:

"Where it appears that court should, in fairness to mortgagee, require payments on mortgage principal, and that financial condition of farmer-debtor is virtually hopeless, court, before denying moratorium under Bankruptcy Act, need not do futile act by first ordering debtor to make certain payments. * * * This in effect means that it is not sufficient for the petitioner merely to institute the proceedings with the wild hope that he will be able to have accepted, by the requisite number and amount of creditors, a plan for liquidation of his debts, but the hope must itself be founded upon reason, which means that there must be some probability of eventually liquidating his debts in conformity with the plan. In short, the act is not to be construed as affording protection to every petitioner who invokes its provisions without having substantially more to recommend him to the court for relief than his bare status as a farmer and his need for assistance."

In Re Davis, 16 F.Supp. 960, 961, D. C.Texas, the court, after pointing out the fact situation and its apparent hopelessness in a case possessing features similar to the one here under consideration, said:

"It is necessary for the chancellor who is administering the estate of the debtor, in order to protect both him and his creditor, to find some equity that should be saved for the debtor, and out of which capital entity, there may be reasonable expectation that the creditors' three-year wait shall not have been in vain. * * * The debtors here seem to be hopelessly involved. They have struggled along for approximately six years, and are worse off now than they were at the beginning of the struggle. * * * An equity for the debtor is not seen and a deprivation of the creditors' rights is quite apparent."

See, also, In re Erickson, 18 F.Supp. 439, D.C.Mich. Also In re Wylie, 16 F. Supp. 193, D.C.S.C., a case very similar in its facts.

In re Llewellin, supra, is both interesting and instructive in that it reflects the view of an appellate court on a proceeding brought under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, where there were immediately involved the rights of the mortgagor and mortgagee and where a stay was sought under conditions there, as here, largely based upon the hopes of the debtor. Among other things the court said:

"Any plan of reorganization must be fair to both parties. The mortgagee is entitled to equal consideration with the mortgagor. While the collection efforts of the mortgagee may well be stayed for a reasonable time provided there exists a reasonable likelihood of her mortgage being paid at that time, it is manifestly unfair to postpone interest payment, repayment of moneys advanced to pay taxes for a period of five years, and leave the mortgagee's recovery of principal and interest to chance or speculative uncertainties based wholly on 'hopes' born of wistful wishing, strong desires or urgent necessities."

In our own Circuit in the recent case of First National Bank of Wellston v. Conway Road Estates Co., 94 F.2d 736, 739, decided Feb. 14, 1938, when dealing with the relative rights of debtor and lienholder under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, among other things the court said:

"In a reorganization proceeding under section 77B good faith means more than honesty of purpose. It also requires that there be a reasonable possibility of successful reorganization. Wright v. Vinton Branch, 300 U.S. 440, 463, 57 S.Ct. 556, 81 L.Ed. 736; * * * Considering the act itself and all these decisions it is apparent that it is the duty of the District Court to bear in mind the purpose and function of 77B at every step of the proceedings; and whenever it appears that rehabilitation of the debtor is impracticable

or that injunctive relief is not sought in good faith the court in the exercise of a sound discretion should refuse the debtor further aid in harrassing lienholders. In this view the contention of the debtor that appellant cannot raise the question of good faith is without merit, since the good faith of the debtor is one of the equities which control the exercise of the court's discretion."

In Dallas Joint Stock Land Bank v. Davis, 83 F.2d 322, 324, the Circuit Court of Appeals of the Fifth Circuit in an action where the debtor's homestead was about to be sold under a state foreclosure decree, and the debtor to avoid such happening sought relief under subsection (s) of the amended act, in holding the act constitutional and discussing many of its provisions, among other things said in the course of its opinion:

"These provisions of the act make it clear, we think, that the act grants no absolute stay, permits no arbitrary or unjust interference with creditors. It merely remits all questions regarding the collection of the debt to an informed judicial discretion, a discretion which, keeping the preservation of the security paramount, may yet, if circumstances permit, afford a means of relief to the debtor. They make it clear that the controlling, the dominant purpose and effect of the act as amended is not to deprive creditors of their security to give it to debtors, but to remit to judicial discretion in each case, whether the facts justify giving the debtor an equitable opportunity in an orderly way, to liquidate his indebtedness, provided always that the essential security of the creditor is not impaired, but preserved."

Attention is called to the two recent cases of Massey v. Farmers & Merchants National Bank & Trust Co., 4 Cir., 94 F. 2d 526, and In the Matter of Martha Francis Cox, Debtor, 22 F.Supp. 925, found in Vol. 35 A.B.R.,N.S., on pages 306 and 398, respectively. In the former of these cases there were two petitions filed by the debtor, the first of which was filed under section 75 and the second under 75(s). In the opinion of the Circuit Court of Appeals of the Fourth Circuit, 94 F.2d 526, 531, 35 A.B.R.,N.S., 306, on page 315 the court had occasion to say:

"We are also of the opinion that the action of the District Judge in dismissing, both petitions was in harmony with the decision of the Supreme Court in Wright v.

Vinton Branch, Mountain Trust Bank, 300 U.S. 440, 462, 57 S.Ct. 556, 561, 81 L.Ed. 736 [33 A.B.R.,N.S., 353]. It was there said that the benefits of section 75(s) may be obtained only by one who has made a bona fide attempt, and has failed, to effect a composition under section 75(a) to (r), 11 U.S.C.A. § 203(a–r); and that the offer of composition must be in good faith, and if the debtor is beyond all reasonable hope of financial rehabilitation and the proceedings under section 75 can have no effect beyond postponing inevitable liquidation, the proceedings will be halted at the outset. See, also, Steverson v. Clark, 4 Cir., 86 F.2d 330 [32 A.B.R.,N.S., 211]."

In the Matter of Cox, D.C.Idaho, 22 F.Supp. 925, the court on page 401 of 35 A.B.R.,N.S., used the following language:

"Fourth; the evidence does not establish the ability of the bankrupt to rehabilitate herself under the terms and conditions of subsection (s). She has not paid taxes on the land for five years, and the buildings and improvements thereon have run down and are not cared for, and that the income from the place has not been of a sufficient amount to care for it, or to earn an amount to pay the taxes, upkeep and fair rental of the property, to be based upon rental value, net income and earning capacity of the property."

There is an apparent misconception in the minds of many of the debtors proceeding under section 75(s) as to the rights of secured creditors to demand a sale of the mortgaged property at public auction and the right to bid in the property for the full amount unaffected by the appraised value. A reading of Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 57 S. Ct. 556, 81 L.Ed. 736, should dispel any doubt in that regard. There the court said in the footnote on page 458 of 300 U.S., 57 S.Ct. 556, 560, 81 L.Ed. 736:

"Amendments to the bill subsequent to its introduction plainly demonstrate careful intention to leave the lien wholly unimpaired. As introduced, the measure provided for retention of the lien 'up to the actual value of such property, as fixed by the appraisals provided for in this section.' * * * As reported out of the Senate Committee on the Judiciary, and as subsequently enacted, the measure provided for retention of the lien unqualified by reference to the appraisal value of the property."

Further on page 459 of the text in 300 U.S., 57 S.Ct. 556, 560, 81 L.Ed. 736, the court said:

"The new Act does not in terms provide for 'The right to protect its (the mortgagee's) interest in the property by bidding at such sale whenever held.' But the committee reports and the explanations given in Congress make it plain that the mortgagee was intended to have this right. We accept this view of the statute."

In note 3 subjoined to the foregoing quotation there appears comment on a report of the Senate Judiciary Committee reading as follows:

" 'To remove a question as to the constitutionality of the bill,' this provision was altered in the course of the bill's passage through the House to deprive the court of discretion in the matter and to give the secured creditor an unqualified right to a public sale as the alternative to a transfer of the property to the debtor at the re-appraised value."

Under note 4, page 459 of 300 U.S., 57 S.Ct. 556, 560, 81 L.Ed. 736, is the following:

"As reported by the Senate Committee on the Judiciary, S. 3002, § 6, p. 9, recognized a right in the mortgagee to bid at the sale not in excess 'of the appraised value or the original principal, whichever is the higher.' * * * In striking out this qualification for the express purpose of avoiding a constitutional doubt, senators responsible for the measure plainly showed that they had no intention of raising a further constitutional controversy by questioning the mortgagee's unqualified right to bid."

The secured creditors at the public sale provided for in the act can bid any sum for the property regardless of its appraised value. In the instant case, the mortgagee can bid up to $3,252.76, with interest to date of sale. That right cannot be taken away from him. It is idle to contend that the bid cannot exceed the appraised value or that the mortgagee would be guilty of bad faith if it bid in excess of the appraised value. The lien of the mortgage is wholly unimpaired regardless of the deflation in farm values. This debtor apparently assumed that he could force the mortgagee to accept the appraised value. The Supreme Court in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, at page 580, 55 S.Ct. 854, 859, 79 L.Ed. 1593, 97 A.L.R. 1106, said:

"This right of the mortgagee to insist upon full payment before giving up his security has been deemed of the essence of a mortgage."

In that it is our opinion that at the outset of these proceedings it was apparent that the debtor possessed no reasonable probability of rehabilitation as contemplated by the act, the petitioners' motions should be sustained and this proceeding should be dismissed. It is so ordered. Exception allowed the debtor.